**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MOORE'S HOME IMPROVEMENT,      :
INC., et al.,                  :
                               :
            Plaintiffs,        :    CIVIL ACTION
                               :
      v.                       :    NO. 10-CV-0161
                               :
NATIONWIDE PROP. & CAS.        :
INS. CO.,                      :
                               :
            Defendant.         :

<u>DECISION</u>

**Joyner, C.J.**                              **August 24, 2011**

<u>BACKGROUND</u>

This case arises out of Defendant Nationwide Property and Casualty Insurance Company's denial of an insurance claim that Plaintiffs submitted after suffering property damage at their place of business.  Plaintiffs have sued Defendant for (1) breach of contract and (2) bad faith under 42 Pa. Cons. Stat. Ann. § 8371.  At the bench trial on February 14-15, 2011, the parties agreed that some property damage was compensable under the insurance policy but disagreed as to (1) the extent of damage to the building's roof, (2) the extent of damage to the building's interior, (3) the extent of damage to the building's contents, and (4) whether Defendant acted in bad faith.  Thereafter, the parties submitted proposed findings of fact and conclusions of law.  (Docs. Nos. 30, 31.)  After consideration of all the foregoing, the Court now makes the following:

1

## FINDINGS OF FACT

1.  Plaintiffs George Moore and Barbara Moore purchased the building at 1274 Virginia Avenue, Bensalem, Pennsylvania, in 2001.  The building had been built in 1950.  (N.T. 2/14/11, at 16, 66, 133.)

2.  The building was the location of Plaintiffs' general contracting business, Plaintiff Moore's Home Improvement, Inc. It contained warehouses, offices, and other rooms, and was used for storage, for some construction, and for administration of the business.  (Id. at 16-34.)

3.  The building was insured for up to $442,638, and personal property within the building was insured for up to $250,000.  The insurer was Defendant, Nationwide Property and Casualty Insurance Company.  (Insurance Policy, Pls.' Ex. 1.)

4.  In late January of 2008, Mr. Moore returned to the warehouse section of the building for the first time in two months.  (N.T. 2/14/11, at 73-74.)  According to Mr. Moore, there was "water coming in warehouse three."  (Id. at 42.)  The "side portion" of warehouse three was wet, and there was water dripping on the vans, ladders, tools, and the "Metro" racks.  (Id.)  In the wood room, Mr. Moore saw water "all over the table saws, the miter saws, the laminate. . . . [I]t looked like about a half-inch of water inside."  (Id. at 50.)  He also saw "a lot of water" near the lunchroom and warehouse one.  (Id. at 42-43.)

2

According to Mr. Moore, when he went up to the roof of warehouse one he saw that a telephone pole that was attached by a wire to the roof had pulled a ten-to-twelve-foot piece of barge board and the rubber roofing off.  (Id. at 43-45.)  On the roof of warehouse two, Mr. Moore observed "just a couple shingles missing on the back side."  (Id. at 46.)  On the roof of warehouse three, Mr. Moore saw that the rubber roof was peeled back.  (Id. at 47.)  On the roof over the wood room, the aluminum that went around the capping was "pulled back and over" and "[t]he whole side was lifted up." (Id. at 48-49.)

     5.  Mr. Moore did not document the damage or notify Nationwide of it.  Instead, he nailed some pieces of the roof back down, screwed other pieces down, and placed a tarp over certain areas.  (Id. at 46-48, 52.)  He also moved items inside the building from the wet areas to dry areas and discarded certain items, removing ceiling tiles, insulation, and cardboard signs.  (Id. at 53-57.)  This process took three or four people and, according to Mr. Moore, around two months.  (Id. at 56-57.)

     6.  There was still leakage from the roof in February of 2008.  (Id. at 79.)  Nonetheless, Plaintiffs did not call a roofer or notify Defendant.  (Id. at 80-81.)

     7.  In March of 2008, Mr. Moore met with public adjuster Joseph Melleski in an unrelated matter, after Mr. Melleski asked Mr. Moore, as a contractor, to render an expert opinion on

3

electrical damage at an unrelated site.  Mr. Moore saw damage
that looked similar to the damage at his building and recounted
this to Mr. Melleski, who suggested that Mr. Moore submit an
insurance claim.  (Id. at 58-60.)  Mr. Melleski also suggested
that a roofer he knew, Joseph McCall, fix Plaintiffs' roof, (id.
at 60), and that the damage was likely caused by a wind storm in
the area on December 16, 2007.  (Id. at 76-79.)

8.  Michael Melleski, Joseph Melleski's son, visited the
building in March of 2008 and prepared an estimate of the repair
cost based on his visit.  He used the Xactomate system, entering
the damage he saw into a program that generated the cost of labor
and materials in a "unit price."  (Id. at 106-07.)  The total
estimate for the roof and interior was $104,676.70.  (Melleski
Estimate, Pls.' Ex. 6.)

9.  On March 20, 2008, Joseph McCall made repairs to
Plaintiffs' roof.  These repairs were to be a "temporary"
measure, (id. at 87-89), and made the roof watertight.  (Id. at
62.)  Mr. McCall took photos of the roof both before and after he
made his repairs and provided these photos to Plaintiffs.  (Id.
at 97.)  Mr. McCall was paid $1650 for his work.  (Roofing
Invoice, Pls.' Ex. 4.)[1]

---

[1] Although Mr. McCall testified at trial that he was paid $650, (N.T.
2/14/11, at 94-95), the Court has determined that the figure appearing on the
invoice, $1650, most accurately reflects the actual amount paid, as the
witness may easily have forgotten or otherwise mistaken the amount charged.
$1650 is also the figure that Defendant arrived at when considering the
invoice.  (N.T. 2/15/11, at 60-61.)

10.   On March 26, 2008, Plaintiffs filed a claim with Defendant, through Joseph Melleski.  Plaintiffs indicated that the loss was due to severe wind and rain on December 16, 2007. (N.T. 2/14/11, at 62; Property Loss Notice, Pls.' Ex. 3.)

11.   On April 25, 2008, Edward O'Rangers, the adjuster whom Defendant assigned to handle Plaintiffs' claim, went to the property with Michael Melleski.  (N.T. 2/14/11, at 161-63.)  Mr. O'Rangers did not see any evidence that the roof had been blown off or otherwise been damaged by wind; rather, it appeared that there might have been a need for maintenance because of age. (Id. at 256.)

12.   Subsequent to Mr. O'Rangers's visit, Mr. O'Rangers had a roofer, Michael Anthony, examine the roof and prepare a report. (Id. at 163-65.)  Mr. Anthony observed many "old and worn" areas in the roof, as well as patches that appeared to be from older repairs.  (Roof Inspection Report, Def.'s Ex. D.)  With the exception of one area where the drip edge was missing, "possibl[y] [from] wind damage," there was "[n]o evidence of storm damage."  (Id.)  Any damage from the drip edge was in an amount below the policy deductible.  (N.T. 2/14/11, at 165-66.)

13.   In light of Mr. O'Rangers's observations and Mr. Anthony's report, Defendant sent a letter to Plaintiffs dated May 14, 2008, denying coverage for the claim.  (Id.; Denial of Coverage Letter, Pls.' Ex. 12.)  The denial letter explained that

5

there was no coverage because Defendant had concluded that the damage was due to "[w]ear and tear" and/or "[r]ust, or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself." (Denial of Coverage Letter, Pls.' Ex. 12.)

Although Mr. McCall had taken photographs before and after he made the repairs, Defendant had not seen these photographs before issuing the denial.  (Id. at 258-62.)  Indeed, at the time the claim was denied, Defendant was unaware of the repairs that had been made to the roof and thus of the original damage. (Id. at 172-74.)

14.  Once Mr. O'Rangers learned of the previous repairs, he told the Melleskis that if Mr. McCall's photos were sent to him, Nationwide could reconsider the claim.  (Id. at 167-68.)

15.  Michael Melleski sent an email to Mr. O'Rangers on June 16, 2008, attaching photos he took of the photos he understood to have been taken by Mr. McCall.  (Id. at 112-13, 115.)

16.  Michael Melleski never received confirmation from Mr. O'Rangers that the latter had received the emailed photos.  (Id. at 116.)

17.  Indeed, Mr. O'Rangers told the Melleskis several times that he had not received the photos.  (Id. at 174-75.)

18.  The photos were not resent, and the claim was not reconsidered.  (Id. at 263-64.)

19.   Plaintiffs' roof was further damaged in February of 2009, and a second claim was filed.  (Id. at 152-59.)

20.   In 2009 and 2010, at the request of their counsel, Plaintiffs sought and received three proposals for the roof repairs they desired.  (Id. at 150-51.)  Joseph S. Smith Roofing, Inc.'s proposal was $64,920 and dated May 12, 2010.  (Smith Proposal, Pls.' Ex. 10.)  Joseph Capella Roofing's proposal was $50,500-56,500 and dated April 7, 2009.  (Capella Proposal, Pls.' Ex. 9.)[2]  Pennypack Contractors' proposal was $43,945 and undated.  (Pennypack Proposal, Pls.' Ex. 11.)

The three proposals were for the same repairs, and there is no explanation in the record for the differences in the roof proposal prices.

21.   On May 25, 2010, Jody DeMarco, an engineering manager with Forensic Consultants of North America, with more than twenty years of civil and structural engineering experience, (Curriculum Vitae, Def.'s Ex. G), viewed the building.  The Moores, the Moores' counsel, Joseph Melleski, and David Barker, a commercial property field specialist with Nationwide, were present.  (N.T. 2/15/11, at 5-6, 40; Report 1, Def.'s Ex. G.)  Mr. DeMarco saw many splits in the roof seams related to "normal wear and tear," which allowed water to enter.  (N.T. 2/15/11, at 11; Report 4, Def.'s Ex. G.)  He also saw "alligator cracking," which is

---

[2]   Some of the numerals composing the figures are unclear, and there was no testimony to confirm what the total cost was.

"normal wear and tear" that ultimately leads to leaks in a roof.
(N.T. 2/15/11, at 15-16; Report 4, Def.'s Ex. G.)  Inside, he saw
evidence of water intrusion, much of it caused by "wear and tear,
and/or lack of maintenance."  (Report 6-7, Def.'s Ex. G.)

    Mr. DeMarco prepared a report opining on the damage caused
by the December 2007 incident.  In sum, Mr. DeMarco concluded
that the roof above warehouses one and three experienced wind-
related damage on December 16, 2007, while the roof above
warehouse two experienced wind-related damage in 2009.  (Id. at
9.)  The interior of warehouses one and three experienced
"localized water damage in the vicinity of the rear wall of the
warehouse" that was related to the wind damage from December 16,
2007.  (Id.; see also N.T. 2/15/11, at 29-30.)  Water damage to
other parts of the building was not caused by the December 2007
incident.  (Report 9-10, Def.'s Ex. G; N.T. 2/15/11, at 21-22.)

    The Court found Mr. DeMarco's testimony credible and his
report, persuasive.

    22.  It was not until the Friday before trial that Mr.
O'Rangers, while going through archived emails, realized that an
email he had received in June of 2008 had Mr. McCall's before and
after photos as attachments.  He "felt terrible" that he had
missed the photos and explained that he had never before seen an
email with attachments in that form.  (N.T. 2/14/11, at 168-71.)
Moreover, this email with the photos had not been part of the

subpoenaed file produced during discovery, such that Mr.
O'Rangers and Defendant did not come across it earlier in the
litigation process.  (Id. at 116.)  His not opening the
attachments and seeing the photos earlier was a mistake.  (Id. at
168-71.)

23.  When Defendant ultimately saw Mr. McCall's before and
after photos, Defendant agreed that there had been compensable
wind damage to the roof.  (Id. at 267.)

24.  To determine the amount of damage that was caused by
the December 2007 incident and compensable under the policy,
Defendant decided to give Plaintiffs the benefit of the doubt by
working from Michael Melleski's March 2008 estimate:  Defendant
accepted all of Mr. Melleski's financial figures for those areas
of the building that Mr. DeMarco had concluded were damaged by
the December 2007 incident.  (See N.T. 2/15/11, at 58 ("I elected
not to conduct my own estimate on the damages of the building
because I was unable to view them when the initial loss occurred.
What I did was, I took into account Mr. and Mrs. Moores' benefit.
I utilized their public adjuster's proposal and took his figures
from his estimate for the areas that Mr. DeMarco deemed as
damaged by wind.  The reason I did that is because I didn't think
that it was fair for me to try to look at photos to determine an
accurate scope of the loss.  I took the public adjuster's
estimates and utilized that, so that there would be no dispute in

scope and or pricing at that time.").)

25.  Mr. Melleski's estimate for roof repairs was lower than
the proposals given by the three roofers for the same work.
Defendant decided to use the figures proposed by Pennypack, which
gave the lowest of the three proposals, rather than Mr.
Melleski's estimate, because Pennypack could actually do the
work.  (Id. at 62.)  Defendant concluded that the price for
repairing those aspects of the roof damaged in the December 2007
incident was $14,195.  (Id. at 63.)

26.  Defendant concluded that the price for repairing those
aspects of the interior damaged in the December 2007 incident was
$27,358.41.  (See id. at 60-61 (stating that the total for the
interior and $1650 in "emergency" roof services by Mr. McCall was
$29,008.41).)

27.  As for the contents of the building, Mrs. Moore
eventually prepared an inventory in the summer of 2010.  She did
this by looking through the "unbelievable mess" in the building,
"[p]iece by piece," to "figure out" what things were; when she
went home, she listed these items in Excel.  Her mother assisted
her with the project.  (N.T. 2/14/11, at 151, 159.)

28.  This inventory listed items in the building during the
summer of 2010; it was not an inventory of items in the building
on December 16, 2007.  (Id. at 160.)  While Mrs. Moore stated
that "the majority of [the items] would have been there" in

December 2007, she acknowledged that some items could have been
brought to the building after the loss.  (Id.)

29.  Once the items were listed in Excel, Mrs. Moore came up
with a replacement cost for each item by either (a) going through
her QuickBooks records if she had purchased the item, (b) looking
online (e.g., at Home Depot and Lowe's websites) for a price, or
(c) having someone from the company from which the item was
purchased provide a price.  (Id. at 151-52.)  The total
replacement cost was $1,013,032.88.  (Inventory, Pls.' Ex. 8.)

30.  David Park, a project estimator with Mellon Certified
Restoration for nineteen years, visited the building in December
of 2010.  (Park N.T. 2/14/11, at 178, 185-86.)  His job was, and
is, to determine (a) if an item is salvageable or has to be
discarded, and (b) how much it would cost to repair or clean a
salvageable item.  (Id. at 179-80.)  Mr. Moore, Mr. Barker, and
Mr. Park's supervisor, Mr. Panico, were present.  (Id. at 186.)

31.  Mr. Park compared the Moores' inventory to the items in
the building and perceived the former as a list of everything
that was in the warehouse, regardless of whether it was damaged.
(Id. at 189-90.)  He examined a sampling of the listed items and
found each one to be salvageable.  (Id. at 190.)

32.  Mr. Moore admitted that items could be cleaned as Mr.
Park said, rather than replaced or discarded.  (N.T. 2/15/11, at
99-100, 106-08, 115.)

11

33.  Mr. Park put together an estimate of the cost to clean, repair, and move the salvageable items, using the "time and material" method to calculate the cost.  (N.T. 2/14/11, at 183-84, 190.)  His estimate of $27,530.11 for all the salvageable items was the price that Mellon and "probably anyone in the industry" would charge for the cleaning, repairing, and moving. (Id. at 203-04; Contents Estimate, Def.'s Ex. I.)

34.  Mr. Park did not know if all the salvageable items were in the building in December 2007 or during the February 2009 incident.  (N.T. 2/14/11, at 205.)

35.  Defendant concluded that the price for cleaning, repairing, and moving the salvageable items that were damaged in the December 2007 incident was $18,469.44.  Defendant arrived at this figure by taking Mr. Park's figures for the items in areas Mr. DeMarco had concluded were damaged in December of 2007. (N.T. 2/15/11, at 68.)

**DISCUSSION**

**A.  Breach of contract**

To succeed on a breach of contract claim under Pennsylvania law, a plaintiff must establish, by a preponderance of the evidence, "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank,

12

N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  "To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.'" Id. at 225-26 (quoting ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 668 (3d Cir. 1998)).  "At a minimum, reasonable certainty embraces a rough calculation that is not too speculative, vague, or contingent upon some unknown factor."  Id. at 226 (internal quotation marks omitted).

In this case, there is no dispute that an insurance contract, with essential terms, existed between the parties. (See Insurance Policy, Pls.' Ex. 1.)  Nor is there a dispute that Defendant breached the contract by failing to pay for covered losses caused by wind damage in December 2007.  (See N.T. 2/15/11, at 58-63.)  Rather, the issue is the extent of covered damage.

### 1.  Roof damage

Defendants agree that they owe $14,195 to repair damage to the roof.  (Id. at 63.)  This figure comes from taking the cost that Pennypack Contractors proposed for fixing the areas of the roof that Mr. DeMarco concluded were damaged in the December 2007 incident and not, for example, caused by wear and tear or the February 2009 incident.

Although Plaintiffs suggest that more areas were damaged and that more money is owed, Plaintiffs have provided no photographs

13

or other documentary evidence to substantiate Mr. Moore's testimony concerning the condition of the roof before the December 2007 incident or when he first noticed the damage, and the Court did not find his testimony fully credible.  For instance, while Mr. Moore characterized the roof as being in "good" condition in the fall of 2007, (N.T. 2/14/11, at 37-38), he admitted that he is not a roofer, (id. at 35), and one of Plaintiffs' own witnesses, who was a roofer, testified that when he was on the roof he "could see the wear and tear over the years." (Id. at 101.)  Moreover, Mr. Moore affirmatively changed the roof's condition twice before contacting Defendant.  In light of the photographs that were taken and entered into evidence, the Court cannot give full credit to Plaintiffs' account of the damage.  In contrast, the Court found Mr. DeMarco's expert opinion on the damage to the roof to be credible.

Nor is there evidence why a more expensive roofer than Pennypack Contractors should be used, especially when Mr. Melleski's own estimate was less than the price given by Pennypack.  In sum, Plaintiffs did not show that roof damage beyond what Mr. DeMarco and Defendant found attributable to the December 2007 incident was in fact attributable to the December 2007 incident and compensable under the insurance policy.  Thus, Plaintiffs have only shown damages of $15,845 ($1650 for the emergency repairs + $14,195 for the permanent repairs).

### 2. Interior damage

Defendants agree that they owe $27,358.41 for damage to the interior of the building.  (N.T. 2/15/11, at 60-61.)  Again, Plaintiffs have provided no photographs or other documentary evidence to substantiate Mr. Moore's testimony concerning the condition of the interior of the building before the December 2007 incident or when he first noticed the damage, and the Court did not find his testimony fully credible.  Mr. Moore also affirmatively altered the inside of the building over a significant period of time before contacting Defendant.

In light of the photographs that were taken and entered into evidence, the Court cannot give full credit to Plaintiffs' account of the damage.  In contrast, the Court found Mr. DeMarco's expert opinion on the damage to the interior to be quite persuasive.

In sum, Plaintiffs did not show that interior damage beyond what Mr. DeMarco and Defendant found attributable to the December 2007 incident was in fact attributable to the December 2007 incident and compensable under the insurance policy.  Thus, Plaintiffs have only shown damages of $27,358.41.

### 3. Contents damage

Defendants agree that they owe $18,469.44 for damage to the contents of the building.  (Id. at 68.)  To the extent that Plaintiffs seek additional compensation, they have failed to

15

provide supporting documentation or testimony concerning the condition of the items and the cause of their damage.  The Court did not find the Moores' testimony on this topic, or their inventory, convincing.  In fact, Plaintiffs' assessment of their damages seems to be little more than speculative opinion.

In contrast, the Court found Mr. Park's expert opinion on the salvageability of the items and the cost to clean and repair them, as well as Mr. DeMarco's testimony concerning the cause of the damage, persuasive.

In sum, Plaintiffs did not show that there was damage to the building's contents beyond what Mr. Park, Mr. DeMarco, and Defendant found attributable to the December 2007 incident. Thus, Plaintiffs have only shown damages of $18,469.44.

### B.  Bad faith

Pennsylvania's bad faith statute for insurance actions provides that,

> [i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:  (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.  (2) Award punitive damages against the insurer.  (3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. Stat. Ann. § 8371.  In the insurance context, courts have repeatedly recognized that "bad faith" has a "peculiar and universally acknowledged meaning":

> "Bad faith" on part of insurer is any frivolous or
> unfounded refusal to pay proceeds of a policy; it is
> not necessary that such refusal be fraudulent.  For
> purposes of an action against an insurer for failure to
> pay a claim, such conduct imports a dishonest purpose
> and means a breach of a known duty (i.e., good faith
> and fair dealing), through some motive of self-interest
> or ill will; mere negligence or bad judgment is not bad
> faith.

Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d

Cir. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990));

see also Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d

680, 688 (Pa. Super. Ct. 1994) ("[T]o recover under a claim of

bad faith, the plaintiff must show that the defendant did not

have a reasonable basis for denying benefits under the policy and

that defendant knew or recklessly disregarded its lack of

reasonable basis in denying the claim.").  Accordingly, "mere

negligence on the part of the insurer is insufficient to

constitute bad faith; recklessness, however, can support a

finding of bad faith."  Polselli, 23 F.3d at 751.  Bad faith must

be proven by clear and convincing evidence.  Id.

Plaintiffs' claim for bad faith is predicated on Defendant's

alleged denial of the claim without having conducted a proper

investigation and Defendant's alleged failure to reconsider the

denial after receiving photos and other information concerning

the before and after state of the roof.

Though Defendant may have been negligent in not reviewing

the before and after photos when it received them, its conduct

17

certainly did not rise to the level needed to find bad faith. The Court found Mr. O'Rangers's testimony concerning his failure to see the photos until the eve of trial to be credible, and the Court is convinced that the failure was accidental.  Without the photos and knowledge of the two sets of repairs made before Defendant was notified of the loss, Defendant had a reasonable basis to question the cause and extent of the damage and, therefore, to deny the claim.  As soon as Defendant saw the photos, it agreed to pay—even though Plaintiffs had been less than diligent in notifying Defendant of the loss, and even though Plaintiffs had affirmatively altered the condition of the property before notifying Defendant.  Plaintiffs have thus failed to prove by clear and convincing evidence that Defendant acted in bad faith.

In light of the foregoing, the Court now states the following:

## CONCLUSIONS OF LAW

1.  Plaintiffs have established by a preponderance of the evidence that Defendant breached its insurance contract by failing to pay $15,845 for damage to Plaintiffs' roof, and Plaintiffs are entitled to this amount.

2.  Plaintiffs have established by a preponderance of the evidence that Defendant breached its insurance contract by failing to pay $27,358.41 for damage to the interior of

18

Plaintiffs' building, and Plaintiffs are entitled to this amount.

3.   Plaintiffs have established by a preponderance of the evidence that Defendant breached its insurance contract by failing to pay $18,469.44 for damage to the contents of Plaintiffs' building, and Plaintiffs are entitled to this amount.

4.   Plaintiffs have not shown by clear and convincing evidence that Defendant's denial of Plaintiffs' insurance claim was a violation of Pennsylvania's bad faith statute, 42 Pa. Cons. Stat. Ann. § 8371.